**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**CECILE JACKSON,**

Plaintiff,

**vs.**

**SECRETARY,**
United States Department of the Air Force,

Defendants.

Civil Court Case No:
**3:25-cv-00427-MCR-ZCB**

**PLAINTIFF'S RESPONSE TO SHOW CAUSE ORDER**

Plaintiff, Cecile Jackson, appearing pro se, respectfully submits this response to the April 9, 2025 Show Cause Order.

**A. Background**

On March 27, 2025, Plaintiff filed her first pro se civil complaint, a Rule 60(d)(3) Fraud on the Court independent action (Doc. 1, 3:25-cv-00427).

FILED USDC FLND PN
APR 23 '25 PM3:59

April 9, 2025, the Court struck the action as frivolous and vexatious (Doc. 8) requiring a show cause, which is provided here in.

**B. Show Cause Concerns and Plaintiff Responses**

*1.* The show cause order reflected several concerns addressed as follows:

*1a.* **Word Limits.** Local Rule 7.1(F) does not apply to newly filed independent actions, prior counsel and DOJ were granted expanded word counts for less complex issues, and the Rule 60(d)(3) decision was based on merits not procedural avoidance (Doc. 16, 11th Cir. No. 25-10038-B, ¶¶6–9).

*1b.* **Piecemeal Filing.** The complaint clearly stated: "Full Amended Complaint Forthcoming," the phase structure was organizational, not fragmented supplementation, and FRCP does not prohibit phased internal formatting within a single complaint (*id.* ¶¶ 21-24).

*1c.* **Vexatious Filing.** Plaintiff has filed one pro se action, no serial abusive pleadings, and the term "vexatious" is misapplied from

sanctioning precedent against attorneys, not pro se litigant acting in good faith (*id.* ¶¶ 14–17, 25-32, 38-41).

*1d.* **Rule 60(d)(3) vs 60(b).** A Rule 60(b) motion was initially contemplated (October 2024) but Plaintiff's evolving understanding of the case and law led to a proper Rule 60(d)(3) independent action instead. The shift was merit-based, legal, and strategic, not evasive (*id.* ¶¶10–13, 18–19, 25–28). Also see Docs. 14 - 16, 11th Cir. No. 25-10038-B.

2. Plaintiff clarifies that incorporation by reference under FRCP 10(c) is not an attempt to circumvent this Court's instructions or word limits, but rather reflects judicial efficiency, continuity of record, and respect for this Court's time. The incorporated filings address, with specificity, the core procedural objections raised in the April 9, 2025 Order.

**C. Re-Litigation Attempt.**

3. The Rule 60(d)(3) complaint is not an attempt to relitigate previously ruled arguments. While the events described in this Rule 60(d)(3) action overlap chronologically with the original Title VII case, this is not a re-

litigation of prior claims.

4. Title VII addressed employment-based harm and focused on Plaintiff as subject of discrimination and retaliation. Rule 60(d)(3), however, arises from a different legal theory, a distinct evidentiary burden, and a separate target of scrutiny: fraud perpetrated against the Court itself by officers of the court and government actors. The same factual timeline may appear in both, but the legal lens, actors, burden, and target are entirely different

5. Plaintiff's Rule 60(d)(3) complaint evidences actions of officers of the court: six (6) JAG attorneys, two (2) Inspector Generals, EEO Director, Plaintiff's EEO Counselor, two (2) senior and one junior (1) military officers, active duty enlisted, and civilian federal employees in a scheme to deliberately manufacture, fabricate, defame, libel, and frame Plaintiff with intent to mislead the court.

6. Evidence further shows a DOJ attorney, former Air Force Assistant Staff JAG Attorney, deliberately submitted the scheme to the Court through distortions, selective evidence omissions and submissions, and attorney client privilege corrupting the Court's decision making. These acts

are not fraud under Rule 60(b), these acts, are fraud on the Court under Rule 60(d)(3) and further detailed here within.

7. Note. The following is not a flowing connected timeline of all events, and represent a subset of action to support the show cause order.

**D. Brief Background and Context**

8. **April 23, 2021 at 6:53 AM.**

9. At 6:53 a.m. on April 23, 2021, Plaintiff filed her first Equal Employment Opportunity (EEO) complaint in over 30 years of military and civilian service.

10. Prior to that moment, there were no allegations, no misconduct, and no disciplinary concerns—nothing. Plaintiff's record was exemplary.

11. Within hours of filing the complaint, an immediate cascade of defamation, false claims, informal inquiries, and investigative activity was initiated—despite no triggering event other than the protected EEO activity itself.

12. Plaintiff was a three-time Civilian of the Quarter, Civilian of the Year, recognized repeatedly for altruistic leadership, and frequently entrusted to brief the entire squadron on sensitive matters. That public recognition, however, ran parallel to private, sustained mistreatment that ultimately compelled Plaintiff to file the EEO claim. Notably, every piece of evidence cited by the Defense—if not fabricated or selectively altered—is dated *after* April 23, 2021, at 6:53 a.m., and therefore cannot serve as legitimate justification for the adverse actions that immediately followed.

13. The events that led to Plaintiff's decision to file the April 2021 EEO complaint are extensively documented in Plaintiff's declarations, rebuttals, and supporting exhibits. These include: EEO Report of Investigations: 1) Nov 27, 2021: 8I1M2100371, 2) Jun 9, 2022: 8I1M2200132, and 3) Aug 11, 2022: 8I1M2200280; Plaintiff's responses to the August 30, 2021 Informal Inquiry, and the nearly 400-page Commander Directed Investigation never presented to the Court (The Court received a 37-page CDI summary).

## E. Rule 60(d)(3) Supporting Events

14. Plaintiff The scheme began on April 23, 2021, less than four (4) hours after Plaintiff's EEO claim.

15. **April 16, 2021**: Plaintiff actually the initial EEO Claim. EEO Counselor Eunice Porter requested multiple re-signings maintaining April 16, 2021 as the filing date.

16. **April 23, 2021 at 6:53 AM,** Plaintiff re-submitted at Porter's request, maintaining April 16. (Emails, April 16, 19, 21, 2021). Evidence shows that at 8:12 AM, the EEO Counselor Eunice Porter, modified the claim date from April 16 to April 23 date (Email, April 23, 2021, 8:12am).

**E.1. The following events all occurred on April 23, 2021 after the date was changed to April 23:**

17. Before 11:11 AM, EEO Director Anthony Avance unofficially informed LtCol Scott Weed, about the EEO claim. Weed denied having advance notice, and Avance also denied but subsequently admitted informing Weed before 11:11AM (Sworn Depo, Weed, Nov 27, 2023; Sworn Depo. Avance, Nov 27, 2023).

18. Scott Davis, Plaintiff's supervisor, a named Harasser in the EEO Claim, contacted EEO-Avance and they planned to enter false statements into Plaintiff's upcoming midterm.

19. Then at 11:11 AM, Weed emailed JAG, IG, and EEO officials with false accusations towards Plaintiff including "overbearing control, lack of trust/empowerment, potential racial discrimination and potential restriction" ongoing on the "last months" (2021 04 23 - v1 Need a Vector3 - USAO at 7).

20. By 12:20 PM, Inspector General (IG) Paul Clark sent a detailed investigatory plan involving evidence collection after the fact, and permitting LtCol Weed to solicit statements from "junior folks," writing they would "drill down into what is being reported" and "determine if EO can conduct a climate inquiry... **absent a formal complaint**" (Email, Apr 23, 2021, v1 Need a Vector at 6).

21. AFI policies require an assigned Investigating Officer to collect statements; however, IG Clark directed the matter to Weed, as the plan was

designed to circumvent "mandatory compliance from the AFMAN" (Need-a-Vector Email v1, Apr. 23, 2021 at 6).

22. By 2:00 PM, JAG Attorney Shelly Frank issued early legal concurrence, without evidence, statements, allegations, no reason, stated: the options were "absolutely appropriate for the situation...I concur" (2021 04 23 - v2 Need a Vector at 3). The legal concurrence violated AFI 90-301's evidentiary review requirement, but also AFI 51-110 (¶7.1.2), ABA Rule 8.4(e), and military ethics prohibiting pretextual endorsement of unlawful command action.

23. The Defense Attorney failed to present that 1) without reason, evidence, or cause, IG planned to collect evidence after the fact, permitted a non-Investigating Officer to collect evidence, and JAG Attorney provide early concurrence without evidence, allegation, or statements; 2) Weed tampered several versions of emails, submitted into federal investigations, EEO severed causality through date changes and delays 3) the actual original email was concealed.

**E.2. Evidence Collection and EEO Claims**

*24.* Four days after Plaintiff's EEO complaint, eighteen (18) memorandum for record statements (MFRs) were produced between April 27 and June 17, 2021, along with undated comment cards presented as pre-existing evidence. Further EEO failed to act on several EEO claims that implicated LtCol Weed and Scott Davis. The details of evidence collection, that immediately followed are detailed in Doc. 1, (3:25-cv-00427, N. D. Fla.).

**E.3. Undated Comment Cards**

*25.* August 18, 2021, in a sworn declaration, LtCol Weed claimed that in April 2021, he received "undated" comment cards filled with anguish and a fear of retribution, like he has never seen before (Weed Decl. – 00371, August 18, 2021, pg. 3-4, ¶ 11b; Weed Decl., April 15, 2022, pg. 5, ¶ 3).

*26.* The Defense Attorney reinforced this timing and exaggeration stating Weed received the cards beforehand and they were the cause of investigating Plaintiff (Defense SJ at 59), the Court agreed "Mid-April 2021" (a date the Court slightly adjusted to "in or around April 2021"), LtCol Weed received undated comment cards full of anguish and claims against

Plaintiff. These cards warranted and justified Weed initiating an investigation against Plaintiff, (Id at 36, Ct. SJ Order at 2-3).

27. The Court "Weed's investigation was initiated in direct response to complaints made via comment cards," (Id at 28).

28. Just as the Avance's early notification, Weed's tampered emails, the distorted time of Plaintiff's EEO claims, the misrepresentation of Shull's transfer, Defense Attorney, concealed sworn deposition from SSgt Buchholz directly contradicting LtCol Weed's timeline narrative and confirms the undated cards were solicited after April 29, 2021 - not before (Sworn Depo. Buchholz, Nov 27, 2023).

29. Buchholz testified that MSgt Sarah Shull approached her under false pretenses, claiming Plaintiff called subordinates "toxic leaders" and threatened their performance appraisals (Id, pp. 7–10, 12, 14–17, 29, 31–35).

30. Further, SMSgt Terrell Breaux, MSgt Catherine Klus, and Scott Davis confirmed all cards were found together[1].

---

[1] Klus Decl. ¶ 1 (Oct. 6, 2021) Davis Decl. ¶ 2 (Apr. 25, 2022); Breaux Decl. ¶ (Apr. 25, 2022)).

31. The cards did not exist and could not have justified Weed's request to investigate Plaintiff.

**E.4. Suicide Threat Exploitation**

32. On **May 27, 2021**, while Plaintiff was out of the office, Lt. Nelson and MSgt Shull conducted a 2- hour counseling session with A1C W. (Moreno Statement, June 3, 2021). After the counseling and overwhelmed, A1C W. yelled three (3) times across the building:

> **"I'll fix this by putting a barrel in my mouth and pulling the trigger"** (Moreno Statement, June 3, 2021).

33. Nelson and Shull took no action to report the threat or seek mental health intervention, leaving the airman at risk over a four-day holiday weekend.

34. Plaintiff learned of this incident the following week, June 3, 2021, and escalated the matter to First Sergeant MSgt Howey, and attempted to counsel Nelson and Shull.

**E.5. Fabricated EEO Claims**

35. In response, on the same day, Nelson and Shull filed retaliatory EEO complaints (June 3, 2021). Shull claimed: On or around 09 April 2021 to 02 June 2021, Dr. Jackson bullied me when she constantly gave me inconsistent feedback which negatively affected my physical and mental health" (2021 06 03, Shull's EEO Claim).

36. Nelson claimed "I continually felt belittled and bullied by her, despite working with Plaintiff for only two months, (Nelson Declaration, May 23, 2022 at 2, 3).

**E.6. Shull's Transfer**

37. On **June 4, 2021**, the next day after the suicide threat, Plaintiff scheduled a meeting with Weed to request Shull's removal from the branch. Weed was unavailable until **June 10**. (2021 06 10, Calendar image). The request was denied. The next day, **June 11, 2021**, Shull approached Weed in tears and requested a transfer—approved immediately.

**E.7. Defense Attorney Distortion**

38. Defense Attorney Andrew Grogan argued that Shull first requested transfer due to Plaintiff's harassment (Defense SJ at 32-33) failing to present that even Weed stated: "This was originally a request from Cecile," (2021 08 18 - Weed Declaration at 20-21, q. 57b and 2022 04 15 - Weed Declaration at 3: 6-7).

**E.8. Anonymous IG Complaint**

39. On June 11, 2025, the same day, of Shull's move, Weed emailed JAG, IG, EEO and others, exploiting Shull's feigned bullying accusations stating: "I'm super focused on: a) sufficiently framing the allegations...with the possibility for command action, and b) having our junior Amn and civilians interviewed by a vested IO as soon as possible." (Email, Need a Vector, v1)

40. Inspector General Clark responded: "We would like to treat this as an "anonymous IG complaint" and weave the issues into a single command directed inquiry and/or investigation…Seems like a meeting of CS, EO, IG,

and JA is needed to sort this out... We can get into names of the "players" (id. ¶ 3).

41. June 28, 2021, two weeks later, Lt Nelson submitted an "anonymous" IG complaint falsely accusing Plaintiff not reporting the very suicide treat she and Shull failed to report, also stating: "I believe she is biased and dangerously negligent," and several other unfounded accusations of selective targeting (2021 06 25 - IG Complaint - USAO - 96CS at 2 ¶ 5a). Metadata extracted from the complaint reveals Metadata extracted from the document confirms that Nelson authored the "anonymous" IG complaint on June 28, 2021 at 3:37 PM CST, under her official U.S. Air Force credentials (Metadata File: 2021 06 28 - IG Complaint - USAO - 96CS).

42. Within 23 minutes of authorship, IG Clark forwarded the complaint to Col. Black—bypassing all required evidentiary screening, review protocols, or threshold vetting under AFI 90-301.

43. In his own declaration, Col. Black admitted: "The only reason I ordered the CDI...was because of the IG complaints. I framed the allegations of the CDI based directly on the IG complaints," (Black

Declaration, Apr 14, 2022 at 6 question 6).

*44.* IG, EEO, and JAG collectively violated their own investigative standards by authorizing Col. Black, a conflicted and directly implicated officer, to initiate and oversee both an informal inquiry and a Commander-Directed Investigation (CDI). AFI 90-301 and DoDD 5505.06 prohibit any conflicted commander from conducting or directing investigative action.

*45.* The Court's Summary Judgment Order explicitly relied on these corrupted processes: "Viewing the record objectively, the Court concludes that the informal climate inquiry and subsequent CDI were legitimate workplace investigations prompted by employee complaints" (Order, pg. 27). The Court further relied on these investigations' findings: "the investigator found that two of the allegations against [Plaintiff] were substantiated" (Order, pg. 4).

*46.* Grogan, as the DOJ official who selected and submitted ECF 18-14 while suppressing Plaintiff's rebuttal and the prior contradictory declarations, meets the standard of an officer of the court who knowingly prevented the Court from reviewing material information.

47. These judicial findings adopt the Defense's manufactured characterization of investigations that were corrupted from inception. The matter therefore meets all requirements for relief under Rule 60(d)(3), as established in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944) and Rozier v. Ford Motor Co., 573 F.2d 1332 (5th Cir. 1978).

**E.9. Weaponization of Military Police**

48. Shull arrived in January 2021 and Nelson in March 2021, during COVID-era telework. Dr. Jackson filed her EEO complaint in April 2021. There was no history, no trust, and no credible circumstances to which unprovoked character defamation would be shared with two newly assigned subordinates with no longstanding rapport.

49. The gross defamations that Plaintiff harassed, bullied, intimidated, committed timecard fraud, telework fraud, was racially biased were invented—by Weed, Nelson, and Shull, under the cover and advisement of inspector general's and JAG attorneys, for which Nelson was awarded Officer of the Year, and Shull Non-Commissioned Officer of the Quarter,

while Plaintiff's accolades were buried. Leading the Court to conclude that Plaintiff versus the actual culprits were the cause, (Ct. SJ Order at 18).

*50.* The defamation was weaponized and even though Weed transferred the culture of targeting Plaintiff continued and normalized even in absence.

*51.* In September 2021, when Plaintiff asked military Policy to comply with COVID mask requirements, in the confined working space, the officer rested his hand on his weapon (2021 09 17 - Jackson MFR - Walk Thru and Safety Concerns at 1 ¶ 5-7). This connects to Weed's June 11, 2021 email stating: "This will be a significant inquiry that will outlive my time here" and noting his plan to "bring in non-EO resources to canvas the shop" (2021 04 23 - v1 Need a Vector3 - USAO, at 4 ¶ 2). As held in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), such retaliatory intimidation qualifies as an adverse action.

**E.10. Commander's Authority**

52. In summary judgment, Grogan argued: "[c]ommanders at all levels in the [Department of the Air Force] may order investigations of individuals,

programs, and processes under their authority..." (Defense SJ at 37). While technically accurate, this statement omits mandatory limitations as the commander 's authority is not untethered and cannot be used to conduct retaliatory investigations (AFI 90-301, AFI 51-602, DoDD 5505.06)

53. The court, relying on this corrupted record, concluded: Plaintiff has not shown how either the climate inquiry or the CDI could be considered an adverse employment action (Ct. SJ Order at 35).

54. This judgment rests on fabricated investigations, manufactured evidence, and systematically falsified workplace narratives - precisely the corruption of judicial process that Rule 60(d)(3) is designed to remedy, as established in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944), Rozier v. Ford Motor Co., 573 F.2d 1332 (5th Cir. 1978), and Cox Nuclear Pharmacy, Inc. v. CTI, Inc., 478 F.3d 1303 (11th Cir. 2007).

**E.11. Impartiality**

55. Defense presented Lt Colt Weed as an advocate for impartiality. Weed claimed the selection of Investigating Officers (IOs) and framing of

allegations were conducted fairly, stating the process would ensure the IO would be "as impartial as possible" and findings would be reported to Col. Black, who would also be "as impartial as possible" (Weed Decl., April 15, 2022, at 6). The Defense reinforced this claim, and the Court was influenced, stating: "Weed received complaints... [and asked about the "most appropriate vehicle to bring an outside IO (Investigating Officer) in to assess the climate impartially" (Defense SJ at 38; Ct SJ Order at 17).

*56.* However, the June 11, 2021 prior to the Inspector General pre-planning the IG complaint, Weed contradicting stated:: "I'm super focused on: a.) sufficiently framing the allegations to get after root cause with the possibility for command action, and b.) having our junior Amn and civilians interviewed by a vested IO as soon as possible to show that leadership is demonstrably engaged" (2021 04 23 - v1 Need a Vector3 at 4 ¶ 7).

*57.* The document further demonstrates that Weed disregarded a real suicide threat and turned it into support for his fabricated claims that Plaintiff was the harasser. Additionally, Weed was not the commander

conducting the investigation, which violated 28 U.S.C. § 1746 and DAFMAN 1-101, requiring the actual Commander conducting investigations to work with JAG to determine allegations (DAFMAN 1-101 at 14, ¶ 4.1).

58. Regarding the selection of investigating officers, the Defense claimed Col. Black took deliberate measures to ensure neutrality: "For the informal inquiry, Col Black chose Lynn Wilson, an African American female from the 96th Force Support Squadron" (Defense SJ at 38-39; Black Declaration, Dec 21, 2023 ECF 18-14). However, Black's prior October 13, 2021 declaration (ECF 18-16) contradicts this claim, stating: "I specifically selected a female investigator who was also a minority ... because I was previously informed of discrimination concerns that may exist within the toxic environment concerns" (Black Declaration, October 13, 2021 at 2-3). This admission shows Wilson's selection was racially motivated and pretextual.

59. The Court accepted the Defense's framing: "On June 23, 2021, Black initiated an informal climate inquiry into SCOS and selected an employee

from outside of Jackson's squadron—Lynn Wilson, an African American female to conduct the investigation. See ECF No. 18--14" (Ct. SJ Order at 3).

Discovery Violations

### E.12. Defense Counsel Discovery

*60.* Three declarations from Col. Black were submitted: the first (October 13, 2021, ECF 18-16) acknowledged racially motivated reasoning for selecting Lynn Wilson; the second (April 14, 2022, ECF 18-21) addressed overlapping topics; and the third (December 21, 2023, ECF 18-14) was submitted after discovery closed, omitting prior admissions and including only 37 pages of the nearly 400-page CDI. Neither of the earlier declarations was cited in summary judgment filings.

*61.* ECF 18-14, submitted more than a month after discovery closed (Final Scheduling Order, ECF No. 9), became the foundation for both the Defense's Summary Judgment argument and the Court's adoption of its factual framing. Nearly every critical assertion concerning the CDI's timing, scope, and neutrality was drawn directly from this declaration—

without disclosing the existence of earlier, contradictory declarations (ECF 18-16, 18-21). The late-submitted, litigation-optimized declaration supplanted the true evidentiary record, violating FRCP 26(e), FRCP 56(e), and constituting fraud on the court under Rule 60(d)(3).

**F. JAG Attorney Dual Roles**

*62.* The Fraud on the Court furthered with the entry of General Law Attorney Daniel L. Warnock.

*63.* Despite holding the title of legal advisor over both the Informal Inquiry and subsequent CDI, Attorney Dan Warnock's involvement was nominal and procedurally hollow.

*64.* Warnock's June 14, 2021 email—"happy to participate… or I can wait until you have specific allegations"—shows his pre-investigative buy-in to a scheme still lacking a factual predicate. As advisor to both the inquiry and CDI, Warnock's dual role violated AFI 51-1101 ¶2.1.3, which prohibits legal counsel from advising on matters where prior involvement compromises impartiality. His transition from eager participant to legal reviewer is a textbook conflict disqualifying the

entire legal validation of both inquiry and CDI. (2021 06 23 - Informal Inquiry Initiated ¶ 5; 2021 09 13 - CDI Initiation Memo ¶ 5, Email, June 14, 2021). However, these details were concealed from the Court.

## G. Informal Inquiry and CDI

65. The informal climate inquiry, conducted by Lynn Wilson, and the Commander-Directed Investigation (CDI) by Mark Wilke, represent the culmination of the institutionally coordinated scheme.

66. The inquiry was a summary-only without supporting documentation (violating Federal Rules of Evidence 1002 and 1003), violation of AFI 90-301's documentation requirements, absence of objective standards for evaluating leadership behavior, reliance on hearsay and opinion disguised as factual findings, and lack of authentication (violating Federal Rules of Evidence 901 and 902).

67. Wilson's summary disproportionately emphasized subjective negative characterizations while systematically omitting contradictory evidence. One in particular, is the deliberate misrepresentation of the May

27, 2021 suicide threat incident. Instead of accurately presenting the documented facts—that MSgt Shull and Lt Nelson failed to report a credible suicide threat from an Airman—the inquiry falsely portrayed Plaintiff as negligent in a situation she had no knowledge of until days later.

68. Contemporary evidence, including a June 3, 2021 memorandum from Alexis Moreno-Rosado was concealed (2021 06 03 - MFR Moreno - Nelson and Shull Hiding Information).

69. The Command-Directed Investigation (CDI) represents a further institutional reinforcement of fraud. The CDI was predicated entirely on an IG complaint that was pre-planned two weeks before it existed.

70. Critical evidentiary and authentication failures rendered the CDI procedurally void. The October 8, 2021 CDI Report was unsigned by Investigating Officer Mark Wilke, violating basic authentication requirements under both military regulations and Federal Rules of Evidence 901 and 902. Of the seventeen witness summaries, eleven were unsigned. The legal sufficiency review was unsigned. The EEO

concurrence was unsigned. The CDI report itself lacked validation. These omissions violate AFI 51-201, AFI 90-301, and FRE 901/902. The record submitted was neither authenticated nor complete, yet was presented as verified fact.

71. The Defense misrepresented the CDI completion date to the Court, claiming: "Col Black received the results of the CDI on February 1, 2022" (SJ, pg. 42), just one day before Plaintiff's resignation.

72. The CDI report is dated October 8, 2021 (CDI Results, Oct 8, 2021), and EEO Director Avance concurred with the results on October 16, 2021, (EEO Concur, Oct 16, 2021)—establishing the CDI was completed nearly four months earlier than claimed. This misrepresentation served a strategic purpose: to artificially sever the causal connection between the CDI's findings and Plaintiff's December 2021 decision to resign.

73. The Court's ruling explicitly relied on the fabricated findings from both the informal inquiry and CDI: "Wilson concluded her investigation finding 'evidence of workplace incivility.' The report described Jackson as a 'very smart and resourceful person' but also a 'micromanager' 'known to

exhibit bullying behavior' and racial bias" (Order, p. 4). These judicial findings, drawn directly from fabricated evidence, formed the foundation for the Court's ultimate conclusion that Plaintiff's claims lacked merit.

74. DOJ Attorney Grogan submitted this timeline to the Court without disclosing that the CDI was completed and reviewed in October 2021—nearly four months earlier. This concealment directly distorted the Court's causal analysis and was instrumental to the Court's conclusion that the CDI post-dated Plaintiff's resignation, when in fact, it pre-dated it.

**H. Physical and Emotional Harm Underscoring Plaintiff's Response**

75. Following the cumulative retaliation, procedural obfuscation, and ultimate constructive discharge from federal service, Plaintiff was diagnosed with Graves' disease—an autoimmune disorder triggered by extreme stress. This was not merely a career wound, but as physiological, and manifesting physically. Plaintiff experienced hair thinning, fatigue, and lasting health impacts directly tied to the prolonged hostile conditions and judicial misconduct.

76. Plaintiff does not offer this as emotional appeal—but as further evidence of the severity and legitimacy of her claims. Fraud-on-the-court is not abstract., and Plaintiff has paid it with her health.

## I. Full Objection

77. Plaintiff disagrees with the Summary Judgment, Summary Judgment Order, Defense 59e response, and the Court's 59e Response. Plaintiff preserves full objection to the Summary Judgment, 59(e) Order, and all underlying rulings for appellate review. These rulings contain multiple **material errors of law**, including misapplication of the constructive discharge standard, failure to apply cumulative hostility under Burlington Northern, and improper deference to fabricated, unauthenticated records. More critically, each ruling was structurally tainted by the fraudulent record presented by officers of the court—rendering the resulting judgment not merely erroneous, but void under Rule 60(d)(3).

## J. Record and Evidence Preservation

*78.* Plaintiff preserves the complete records from all three (3) EEO Report of Investigations, Informal Inquiry, the comprehensive full, 397-page CDI Report of Investigation in addition to the 38 paged version submitted to the court under ECF 18-14 "Exhibit Declaration Kenneth Black signed w Exhibits" all supporting materials referenced therein. Plaintiff also preserves all Defense and Plaintiff filings, declarations, attachments, emails, exhibits, and internal correspondence contained within the District docket, the Eleventh Circuit docket, and all exhibits previously filed under seal or as part of withdrawn or struck pleadings.

*79.* Plaintiff notes that one Report of Investigation (ROI), required to be part of the record, was misfiled or mislabeled in the District case docket. A duplicate version bearing the same label was submitted in place of the correct ROI. Plaintiff retains a complete and dated copy of the correct ROI and preserves it for appellate and Rule 60(d)(3) review. Plaintiff respectfully notifies the Court and Eleventh Circuit that this ROI—though referenced in prior filings—has not been properly entered into the record and is preserved for inclusion upon order or remand.

## K. Constructive Discharge and Claim Exhaustion

80. The Court records are not an accurate reflection of the events.

81. When the Court stated, the Plaintiff failed to show reason for constructive discharge, the above acts exceed the constructive discharge requirements. Further, the EEO investigations were a sham process and not a process at all. "Where the administrative process is wholly ineffective due to bad faith, obstruction, or procedural nullity, courts have excused exhaustion." — *Patsy v. Board of Regents*, 457 U.S. 496 (1982); *Smith v. Potter*, 400 F. Supp. 2d 836 (E.D. Mich. 2005)

82. "Where the agency deliberately frustrates the process, no valid exhaustion occurs." — *Moore v. U.S. Postal Serv.*, 755 F.2d 624, 629 (8th Cir. 1985). Courts do not permit defendants to benefit from their own fraud by invoking procedural defenses based on records they themselves corrupted. — See *Hazel-Atlas Glass, Cox Nuclear, Rozier.*

83. No legitimate EEO investigation ever occurred. From the day of filing, the process was corrupted by unauthorized disclosure, retaliatory coordination, and direct participation of the named harasser. Under

binding federal regulations and controlling exhaustion doctrine, a sham process—especially one seeded by procedural fraud—does not trigger exhaustion requirements nor bar Rule 60(d)(3) review.

**L. Legal Application to Show Cause Order Response**

This section responds to the Court's April 9, 2025 Show Cause Order and applies the factual record to the fraud-on-the-court framework previously detailed in Plaintiff's March 27, 2025 Complaint (Doc. 1). Plaintiff references that filing for the full articulation of the governing legal standard, including controlling precedent under Travelers Indem. Co. v. Gore, Hazel-Atlas, Rozier, and Cox Nuclear, as well as Rule 9(b) and 12(b)(6) pleading requirements, necessary to show cause.

**L.1. Misconduct by Officers of the Court**

The facts presented show that JAG attorneys, IG officials, EEO leadership, and DOJ counsel each held institutional roles obligating heightened candor under Model Rule 3.3 and Rule 11. As detailed, legal concurrence was granted before any investigative facts existed. IG approval preceded

complaint documentation. DOJ presented a selectively curated summary declaration (ECF 18-14) post-discovery while suppressing earlier versions and rebuttal testimony.

These actions—timed and structured in sequence—support a strong inference that the litigation team and originating officials knowingly constructed a record engineered to survive judicial scrutiny while concealing its retaliatory origins. That sequence implicates officers of the court in a manner consistent with Travelers, 761 F.2d at 1551–52, and Cox Nuclear, 478 F.3d at 1314.

**L.2. Corruption of the Judicial Machinery**

The Court's summary judgment ruling was built upon: a falsified EEO timeline, A litigation-optimized declaration submitted after discovery, fabricated comment cards, a manufactured IG complaint, and omitted declarations and exculpatory evidence. Each element was designed to appear procedurally legitimate while concealing retaliatory motive. See *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245–46 (1944).

### L.3. Obstruction of Truth-Finding

The record presented to this Court excluded critical facts: metadata-authored complaints, original email chains, and rebuttals to declarations submitted in discovery. That concealment shaped the Court's ruling—not on the merits, but on a record curated through omission. See *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978).

### L.4. Deliberate Scheme to Withstand Scrutiny

IG implemented investigatory steps pre-cleared by command. JAG issued legal clearance before facts existed. DOJ submitted altered records with adjusted timestamps to match deposition testimony.

This fraud was not isolated—but Synthetically converged: a procedurally laundered record, manufactured through coordinated validations across JAG, IG, EEO, command, and DOJ, and judicially adopted as neutral fact.

### M. Defense Attorney Presentations

*84.* **CDI. Grogan:** "[Plaintiff] did not exhaust any claim regarding the CDI… did not make initial contact with EEO about it until November 23,

2021. Thus, this claim is barred" (Defense_SJ at 42-43). **Court:** The Court agrees (Ct. SJ Order at 30). **Plaintiff:** Evidence shows Plaintiff contacted EEO before Oct 25, 2021 about the CDI investigation (Email, Oct 25, 2021, Pl to EEO-Porter).

*85.* **Constructive Discharge. Grogan:** "claim is barred because Dr. Jackson failed to file her complaint in District Court within 30 days of receipt of the Final Agency Decision" (Defense_SJ at 48). **Court:** "claim is untimely" (Ct. SJ Order at 33). Plaintiff: Grogan withheld evidence of EEO involvement, unauthorized early notification, informing Weed, and collaborating with a named Harasser. Evidence supports the 30-day deadline is unenforceable timeliness flows from a valid process and Grogan withheld evidence that EEO was wrongly involved from the outset. *Kloeckner v. Solix; Cox Nuclear Pharmacy*. (Sworn Depo, Avance, Nov 27, 2023; Sworn Depo, Weed, Nov 27, 2023; Email, Need a Vector thread, April 23, 2021).

*86.* **Attorney-Client Privilege**: Attorney–client privilege was invoked involving Paul Clark (IG), William Garrick (IG), Daniel Warnock (JAG),

and Col. Kenneth Black. These communications predated the formal submission of the "anonymous" IG complaint on June 25, 2021, revealing that DOJ sought to protect coordination efforts before any neutral complaint existed. The privilege wall was constructed to conceal a scheme still in progress.

87. These are a few of the concerns addressed in Rule 60(d)(3), further supporting Plaintiff's merit-based independent action.

## N. Distinction from Rule 60(b) and Prior Litigation

This case is not a veiled appeal of the Title VII ruling. The claims presented here arise from post-filing misconduct: altered evidence, contradictory declarations, and deliberate submission of falsified records. These facts were never part of the Title VII adjudication. The Rule 60(d)(3) action is independently docketed because it seeks vacatur of judgment based on court-targeted fraud, not judicial error or dissatisfaction with the outcome.

### N.1. Finality Yields to Integrity

The judgment cannot be preserved if it was procured through deliberate deception. As *Hazel-Atlas* made clear, the Court's function is not to protect prior rulings—but to protect the adjudicative process itself. The structural fraud here prevented impartial adjudication and cannot be cured through finality doctrine.

**N.2. Evidentiary Threshold - Clear and Convincing Standard**

The Show Cause Order does not challenge Plaintiff to prove her case but to demonstrate that the claims are procedurally proper and not duplicative. The facts provided meet that burden.

**O. Protective Measures**

*88.* All cited evidence is on file with the Plaintiff, encrypted, and redundantly stored across multiple platforms with real-time synchronization. Integrity safeguards ensure consistency, with automated protections triggered by defined divergence thresholds and periods of inactivity. These measures are deemed necessary given the involved actors

and Plaintiff's pro se status. The protective mechanisms are asserted as work product under FRCP 26(b)(3).

**P. Conclusion**

*89.* The Court was never told that military police canvassed Plaintiff's workspace, that one officer placed his hand on his weapon, or that this escalation was the direct result of fabricated portrayals presenting Plaintiff as a threat.

*90.* The Court never saw that the underlying accusations—timecard fraud, telework abuse, subordinate bullying—were manufactured through coordinated defamation, not facts.

*91.* Details were not presented that statements were solicited under false pretenses, or that "motivational emails" were used to manipulate the workforce, build consensus against Plaintiff, and provoke retaliation and disent. The Court never learned that one such email Black Hawk down, was directed at Plaintiff, and another on the same day Plaintiff counseled Nelson and Shull about the Suicide treat, stating "For the strength of the

Pack is the Wolf, and the strength of the Wolf is the Pack.... your Squadron is your pack," nor on her last days of work while out-processing she was tainted, and received a final "motivational" message "There's a scene in the final climax in the movie, The Gladiator, where after the main character is stabbed in his ribs, he was expected to fight to the death with an evil emperor... He lost his wife, his son, his position of power, his wealth, and his respect." The Defense presented them has harmless and the Court agreed. However, the emails rendered metaphors neither harmless nor coincidental—they were targeted, coded narratives of psychological coercion.

92. The Court was never told JAG signed premature legal concurrences before any evidence existed—nor that after over 5 months of continuance harassment and after the Police incident, Plaintiff took FMLA leave, only to receive anonymous hang-up calls, requests to sign perfect appraisals for named harassers, and many other events not included in the show cause due to time and word limitations.

93. Instead, the Court received Defense Attorney's version. A record where Plaintiff, not the institution, was the problem. Where she was depicted as racially biased and falsely accused of referring to her harassers as "bigots".

94. The Court, trusting that narrative, echoed:

> "Jackson did not suffer an adverse employment action even under the more lenient retaliation standard. Jackson's resignation did not constitute an adverse employment action because she was not constructively discharged, and Chaplain Lee's emails, Davis's comments, and her subordinates' behavior plainly constitute "trivial harms, petty slights, minor annoyances, and simple lack of good manners… In sum, Jackson has not presented any evidence that she suffered any mistreatment at all based on her race, or gender, or retaliation for complaining about discrimination on these grounds." (Ct. SJ Order)

95. The Defense and Defense Attorney omissions were not passive but contaminated judicial decision-making. This is not Rule 60(b). This is **fraud on the court** under Rule 60(d)(3)—egregious, deliberate misconduct by

officers of the court that corrupted the adjudicative process and demands vacatur as a matter of law.

96. Court rulings are sacred. They are not just the fabric of this country—they are the needle and the thread that binds its principles. When that fabric is corrupted, not by accident or oversight, but by **willful, coordinated deception,** the harm is structural. The Court deferred. Yes—it trusted the right hand, as courts often must. Schedules, caseloads, vexatious filings—these demand triage. But that deference was exploited. Defense Attorney leveraged the Court's lack of military knowledge and its institutional trust in government counsel to insert a false narrative into the record, then asked the Court to rule on the fiction he presented.

97. Fraud within the courtroom is serious. But fraud allowed to seep into the courtroom—facilitated by the very officer entrusted to protect it—is a grave concern. That is why Rule 60(d)(3) exists: not to correct mere injustice, but to vacate the judgments that were built on lies.

*98.* Even where every procedural safeguard inside the agency has failed—even where the retaliation was premeditated, the investigations were fabricated, and the records were engineered—there remains one firewall that must never break: the duty of candor held by officers of the court. In this case, that firewall was DOJ Attorney Andrew Grogan. And that firewall failed.

*99.* Grogan did not simply misinterpret evidence. He exploited the Court's deference. He did not merely miss facts. He curated them. Grogan, a former Air Force JAG, knew the weight of institutional trust placed in his hands. He understood the significance of judicial deference—especially in military cases where courts understandably rely on counsel to bridge the gap in procedural expertise. And yet, he knowingly allowed fraudulent investigations, falsified emails, and procedurally laundered timelines to be presented as legitimate.

*100.* Had Grogan upheld his duty—to this Court, to the public, and to the law—the Court and I would not know each other. This case would have resolved through integrity, not been prolonged through deception.

101. But Grogan did not hold the line. He was not merely complicit in the fraud—he was the final layer of institutional laundering. He allowed known falsities to reach this Court. He suppressed contradictory declarations. He submitted timeline-adjusted exhibits tailored to match deposition testimony. He became the mechanism by which military fraud entered the judicial system.

## REQUESTED RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court:

102. Vacate the Order striking the March 27, 2025 Rule 60(d)(3) complaint (Doc 1).

103. Permit the action to proceed for adjudication on its merits.

104. Permit a full consolidated amended to Doc 1 that incorporates all phases in a single filing.

## CERTIFICATE OF COMPLIANCE: WORD LIMIT

The undersigned certifies that the foregoing complies with Local Rule 7.1(F) and contains ~6452 words, excluding the case style, signature block, and required certificates.

Respectfully submitted,

DATED: April 23, 2025

**/s/Cecile Jackson**
Cecile Jackson
Plaintiff, ***Pro Se***
2551 Salamanca Street
Navarre, FL 32566
email: jacksonLegalCase@gmail.com
Telephone: (850) 341-9285

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

CASE NO: **3:23-cv-03881-MCR-HTC**

## CERTIFICATE OF SERVICE

I, Cecile Jackson, do hereby CERTIFY that a true and correct copy of the foregoing Plaintiff's Response to Show Cause Order has been furnished to the following via CM/ECF by Court Clerk:

**Clerk, U. S. District Court**
1 North Palafox Street
Room 226
Pensacola, FL 32502-5658

DATED: April 23, 2025.

***/s/Cecile Jackson***

Cecile Jackson
Plaintiff, *Pro Se*
2551 Salamanca Street
Navarre, FL 32566
email: jacksonLegalCase@gmail.com
Telephone: (850) 341-9285